J-S24024-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RONALD W. HARSHMAN, | |
| Appellant | No. 1620 MDA 2015 |

Appeal from the PCRA Order August 20, 2015
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0000851-2000

BEFORE:  GANTMAN, P.J., BOWES, AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 03, 2016**

Ronald W. Harshman appeals from the August 20, 2015 order denying him PCRA relief.  We affirm.

The present criminal case arises from the death of Melvin Snyder. During May 1984, Snyder and Teresa Harshman, who was Appellant's wife at that time, began an extramarital relationship.  Snyder also was married.  On June 7, 1984, Snyder and Teresa revealed their affairs to their respective spouses, and said that they were leaving them.  When Teresa told Appellant, he reacted violently.  Specifically, Appellant obtained a weapon, intentionally crashed his car into Snyder's vehicle, and fired two shots, which closely missed their intended target, Snyder.  N.T. Trial, 7/10/01, at 106-07. Criminal charges were filed, but Snyder asked that they be withdrawn.

The following day, Snyder and Teresa left for Montana to avoid Appellant, but continued to call their respective homes to speak with their children. Snyder's wife Joan went to Appellant's house on June 8, 1984, to discuss the matter with him. Appellant told Joan that Snyder "had taken his property and he was going to get even with him sooner or later." N.T. Trial, 7/11/01, at 48. The two abandoned spouses commiserated together while Teresa and Snyder were in Montana. During this period, Appellant told Joan that he had "meant to kill" Snyder on June 7, 1984. *Id*. at 51. Appellant also repeatedly indicated that he would get revenge, sooner or later, for Snyder's actions.

In July 1984, Teresa and Snyder returned from Montana, ended their affair, and re-united with their spouses. Joan and Snyder successfully reconciled. Appellant, however, could not place the matter behind him, and he continued to make threatening remarks, telling various people that he intended to exact revenge against Snyder. For example, Appellant told Snyder's son that he would get even with Snyder at some point in time.

In fall 1984, Joan called Appellant because she was concerned about Appellant's comments. Appellant responded that "he was going to torment [Snyder] and just keep tormenting him. He was just going to get him." *Id*. at 59. When Joan asked Appellant to put the events behind him, Appellant responded, "I can't. He said I'm going to get [Snyder] sooner or later." *Id*.

Joan and Appellant spoke again in late 1984 or early 1985, when Appellant made similar threats.

The reconciliation between Teresa and Appellant was unsuccessful, and Appellant physically abused Teresa by choking her on two occasions. In March 1985, Teresa left Appellant again, and she filed for divorce on March 17, 1985. Appellant blamed Snyder for his marriage's demise. Within days of being served with divorce papers, Appellant purchased a .25 caliber pistol, which he used to threaten a man dating Teresa.

Appellant telephoned Joan in March 1985 and informed her that he was watching Snyder and "time was drawing near[.]" *Id*. at 63. In early May, Appellant again telephoned Joan and continued to make threats against Snyder. Joan told Appellant to "just let it alone for God sake. Let it alone. He said I can't. He took my property. He's going to pay." *Id*. at 65.

At 5:45 a.m. on May 25, 1985, Joan left for work, and Snyder told her that he planned to spend the day working in the barn and garden. When Joan returned from work at 1:30 p.m., her husband was gone, his tools were scattered around the yard, and the barn showed signs of a disturbance. Snyder has not been seen or heard from since May 25, 1985, and he was reported as missing on May 27, 1985, when police found his pick-up truck in Maryland. That vehicle contained the victim's gun, wallet, and checkbook, and it had been wiped clean of fingerprints.

Neighbors of Snyder saw a two-toned brown pick-up truck, which did not belong to the victim, parked next to the barn on Snyder's property at about 10:00 a.m. on May 25, 1985. They then saw the truck, which Appellant purchased in 1984, parked at Appellant's home. Since Snyder had left with Teresa the previous year, police refused to treat his disappearance as a criminal matter absent signs of foul play. Joan and relatives scoured the barn and discovered a .25 caliber pistol shell. As Snyder did not own a .25 caliber weapon, Joan gave it to police. In June 1985, police searched Appellant's home, finding an empty box for a gun and a partially empty container of .25 caliber ammunition. When asked about the missing weapon, Appellant informed police that his wife had it. Teresa denied that report.

In 1993, Snyder was declared legally dead. Appellant eventually moved from the house where he lived in 1985. Thereafter, in 1999, police searched that property with metal detectors. A .25 caliber shell casing was found buried in the ground, and it was fired from the same gun as the shell discovered in Snyder's barn in 1985.

In April 2000, Appellant and Joan Snyder were arrested and charged with homicide, but the charges against Joan, who had told her husband about all of her conversations with Appellant, were later withdrawn. In July 2001, Appellant proceeded to a jury trial, where the jury heard the above-delineated evidence.

The Commonwealth also presented the testimony of three inmates, Randi Kohr, Keith Granlun, and Wallace Jones, who had been housed with Appellant while Appellant was in jail after his arrest and before he was released on bail in September 2000. Kohr said that, while they were playing cards, Appellant told him that he killed a man by shooting him five times and then "got rid of his body." N.T. Trial, 7/12/01, at 28. Appellant explained to Kohr that the motive for the murder was that Appellant's wife cheated on him, and Appellant reported, "[T]here would be no evidence. There's no gun, no body, no casings he said. There's no evidence against me." *Id*. at 29.

Granlun, who was in jail for driving under the influence and unsworn falsifications, testified that, before he was jailed, he had been a minister and that other prisoners came to him for aid with spiritual matters. Appellant approached Granlun and asked to speak to him about something. Appellant told Granlun "that he murdered somebody years ago." *Id*. at 41. Appellant "wanted to know if he could be saved for that," and Granlun gave him spiritual advice. *Id*.

Jones was known in prison for doing legal research for different inmates. Jones told the jury that Appellant came to him for legal advice and "asked me if I could find anything where it was known in Pennsylvania for someone to be tried for a homicide without a body ever actually being

found." *Id*. at 33. Appellant explained that in his case, "there's no body or a gun and they won't find one." *Id*. at 34.

The jury found Appellant guilty of first-degree murder, and he was sentenced on July 13, 2001, to life imprisonment. On direct appeal, we affirmed. *Commonwealth v. Harshman*, 815 A.2d 1126 (Pa.Super. 2002) (unpublished memorandum), *appeal denied*, 847 A.2d 58 (Pa. 2004), *certiorari denied*, 543 U.S. 932 (2004). Appellant filed a timely *pro se* PCRA petition, counsel was appointed, and counsel filed an amended petition, claiming, *inter alia*, that Granlun and Kohr had recanted their trial testimony. Three evidentiary hearings were held on the amended petition in 2009. At those proceedings, Granlun and Kohr invoked their constitutional privilege against self-incrimination as to all questioning.

The PCRA court denied relief on September 13, 2010. On appeal from that denial of relief, Appellant raised various contentions. *Commonwealth v. Harshman*, 32 A.3d 848 (Pa.Super. 2011) (unpublished memorandum). Pertinent to the present appeal is the fact that Appellant raised this averment: "Did the Court err in not admitting into evidence corroborating evidence, physical and testimonial, that material Commonwealth trial witnesses[, Kohr and Granlun,] lied at Petitioner's trial and that a deal existed between the witnesses and the Commonwealth in exchange for testimony which was not disclosed to the jury?" *Id*. at 2-3. In the 2011 appeal, the panel examined each piece of extrinsic evidence that Appellant

- 6 -

had sought to introduce to impeach Kohr and Granlun, analyzed it, and concluded that the PCRA court correctly refused to admit that proof. *Id*. at 5-8.

However, in 2011, we did reverse and remand as to one issue. This Court concluded that the PCRA court should have allowed Appellant to ask specific questions of Granlun and Kohr in the face of their invocation of the Fifth Amendment. We held that the court should have determined, in response to each inquiry posed by Appellant, whether the witness had a reasonable fear of self-incrimination if he responded to the question.

After the 2011 remand, the PCRA court held two additional evidentiary hearings, where Kohr again refused to testify based upon his right against self-incrimination. Granlun, on the other hand, stated that he had a secret arrangement with the Commonwealth whereby the district attorney offered him immediate release from prison, termination of parole, and remission of fines in exchange for his trial testimony. The PCRA court thereafter concluded that Granlun was not credible, found that there was no deal between Granlun and the district attorney in exchange for Granlun's testimony, and denied PCRA relief a second time on March 11, 2014.

Appellant filed another appeal and raised various issues. *Commonwealth v. Harshman*, 120 A.3d 392 (Pa.Super. 2015) (unpublished memorandum). Relevant to the instant matter were Appellant's averments that the PCRA court: 1) disobeyed the 2011 remand

order by again allowing Kohr to blanketly invoke his Fifth Amendment privilege rather than permitting Appellant to ask specific questions of Kohr and then ruling whether Kohr had a reasonable fear of self-incrimination if he responded; 2) erred in failing to find that there was a surreptitious arrangement between the Commonwealth and Granlun in exchange for Granlun's testimony; and 3) improperly prohibited Appellant from introducing extrinsic evidence that Kohr perjured himself at trial and had an undisclosed arrangement with the Commonwealth in exchange for his trial testimony.

The 2015 panel agreed with Appellant's first contention since the PCRA court admitted that it "again found that Kohr was entitled to blanket immunity from defense counsel's questioning. While the Superior Court ordered us to allow individual questions and invocation of the Fifth Amendment for each specific question, we respectfully disagree with the Superior Court's decision." PCRA Court Opinion, 6/10/14, at 7. In the 2015 *Harshman* decision, this Court remanded for another PCRA hearing, where Appellant was to be permitted to question Kohr in accordance with our 2011 directive.

On the other hand, in the 2015 appeal, we affirmed all of the other rulings rendered by the PCRA court in 2014. The 2015 panel specifically upheld the PCRA court's conclusion that no deal existed between Granlun and the Commonwealth. This Court also rejected Appellant's position that

"the PCRA court erred in excluding corroborating evidence that Mr. Kohr lied at Appellant's trial in exchange for a deal with the Commonwealth." *Harshman*, *supra* (2015 decision, unpublished memorandum at 12). We noted that, in the 2011 appeal, this Court specifically ruled that the same extrinsic evidence proffered by Appellant as to Kohr was inadmissible at the 2009 hearings. The 2015 panel concluded that this issue was litigated in 2011 and that "the PCRA court [during the 2013-2014 hearings] properly precluded the proffered evidence." *Id*. at 13.

On remand, the matter was assigned to a different judge, who followed our directive regarding the Fifth Amendment during a May 21, 2015 evidentiary hearing. Kohr was called to testify and answered many questions, invoking the Fifth Amendment only with respect to specific matters. Kohr denied that there was any undisclosed arrangement between the Commonwealth and him in exchange for his testimony and re-affirmed that Appellant confessed to him that he murdered Snyder. The PCRA court thereafter denied relief on August 20, 2015, and this appeal followed. Appellant raises these contentions for our review:

> 1. The Court erred by determining that no undisclosed deal existed between Randi Kohr and the Commonwealth whereby Randi Kohr received assistance from the District Attorney with the parole board in exchange for Randi Kohr's testimony against Mr. Harshman at trial.
>
> 2. The Court erred by determining that the non-disclosure of such a deal, in light of other witness testimony regarding the untruthfulness of Mr. Kohr and other recanted testimony by trial

witnesses, is not sufficient to warrant a new trial for Mr. Harshman.

Appellant's brief at 3.

Initially, we note that our "standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error." **Commonwealth v. Smith**, 121 A.3d 1049, 1052 (Pa.Super. 2015). We reject Appellant's first position as the evidence of record supports the PCRA court's determination that there was no undisclosed agreement between the Commonwealth and Kohr when Kohr testified at Appellant's trial. Concomitantly, we find no error with the PCRA court's refusal to grant a new trial.

We examine the pertinent proof. At the evidentiary hearing held on September 10, 2009, Appellant presented the testimony of Kohr's wife at that time, Megin Kohr. Megin said that it was her understanding that a deal existed between Kohr and Franklin County District Attorney John F. Nelson that, if Kohr testified in Appellant's case, Mr. Nelson would release Kohr from jail.

The Commonwealth countered this testimony with evidence from District Attorney Nelson, who has since died, and former Franklin County Detective Mark Christman. Mr. Nelson said that Megin was wrong, and,

while she may have believed that Kohr had a deal to obtain his release before the end of his prison term, Megin misunderstood the arrangement.

Mr. Nelson explained that, as a county prosecutor, he did not have the authority to obtain early release for Kohr because in 2000-2001, Kohr was under the supervision of the Pennsylvania Board of Probation and Parole (the "Board"). Before Kohr testified at Appellant's trial, Mr. Nelson wrote two letters to the Board telling it that "Randi Kohr has agreed to cooperate." N.T. Hearing, 8/3/09, at 71.

While Mr. Nelson hoped that the Board would consider Kohr's cooperation when determining whether Kohr should be paroled, the letters were ineffective. Mr. Nelson delineated that the Board did not "give a s___ what I think. I told [Kohr] I'd write a letter. That's what I did." *Id*. at 74. Mr. Nelson reported that, by the time Kohr testified at Appellant's trial, Kohr already knew that Mr. Nelson's letters had not convinced the Board to release him from prison. Mr. Nelson said that he and Kohr talked about the matter after the Board's decision, and Mr. Nelson told Kohr that there was nothing further that he could do. Detective Christman confirmed Mr. Nelson's testimony. N.T. PCRA Hearing, 12/14/09, at 3-6.

A copy of one of the letters sent by Mr. Nelson to the Board is included in the record. The letter is dated January 19, 2001, and indicates that the other letter was sent November 28, 2000. The timing of the letters confirms the representations of Mr. Nelson and Mr. Christman since both were sent

months before Appellant's July 2001 trial, and Kohr was not released from prison until 2007. In further affirmation of Mr. Nelson's delineation of the arrangement, his January 19, 2001 letter informed the Board that Kohr was testifying in a murder trial, and that Mr. Nelson told Kohr that "in exchange for his cooperation that **I would ask the Board to take that cooperation into consideration** in determining what the Board action would be." Order of Court, 5/21/15; Defense Exhibit 3 (emphasis added).

At trial, Kohr denied that his testimony was given in exchange for some type of favorable treatment in connection with his own criminal charges. On cross-examination, he stood firm in that respect:

> Q: So, Mr. Kohr, you're telling us that you're doing this because you're thinking about your duties as a citizen; is that right?
>
> A: Yeah, I guess you could put it that way.
>
> Q: You're telling us that you didn't make this statement to the State Police because you thought it would get you anything?
>
> A: No. No one can give me anything or help me out. I knew what I was doing. Nobody in Franklin County can do anything with state parole. State parole doesn't care what anyone has to say to them. They do what they want.

N.T.Trial, 7/12/01, at 29-30. This statement supports Mr. Nelson's indication that his efforts on behalf of Kohr with the Board were unsuccessful and that Kohr was aware of that fact when he testified.

At the May 21, 2015 PCRA hearing, Kohr re-affirmed that he had not testified in exchange for Mr. Nelson's pre-trial letters to the Board. He said,

- 12 -

"It was not like a deal or nothing like that. I asked him about it and he said he would write to them, on my behalf." N.T. Hearing, 5/21/15, at 27. Kohr insisted, "My testimony had nothing to do with making a deal or anything to get out or cooperation, anything like that." *Id*. at 36.

This proof amply supports the PCRA court's determination herein that there was no "undisclosed deal between Mr. Kohr and the Commonwealth." PCRA Court Opinion, 10/29/15, at 13. Mr. Nelson agreed to write to the Board to apprise it of Kohr's cooperation and ask it to take that cooperation into consideration in its parole decision. He did that action as a courtesy to Kohr, knowing that he could not actually influence the Board. His letters, which were written prior to trial, had no effect on the Board since it did not grant Kohr parole.

Significantly, Appellant offered no evidence to refute either that the Board's decision as to Kohr's parole was rendered before trial or that Mr. Nelson, a county district attorney, had the ability to influence the Board. Hence, we conclude it was not an abuse of discretion for the PCRA court to find that there was no undisclosed deal between Kohr and the Commonwealth that Kohr would be released from jail if he testified against Appellant.

To establish the existence of an arrangement, Appellant suggests that the PCRA court incorrectly refused to consider certain extrinsic evidence.[1] Appellant's brief at 6. We examine the enumerated proof. First, there is a May 1, 2006 typewritten document[2] wherein Kohr's trial testimony is recanted, and it is stated that he testified in exchange for favorable treatment in his own criminal matter. The instrument is allegedly signed by Kohr, who refused to authenticate his signature or acknowledge the contents of the writing at the May 21, 2015 PCRA hearing, and it was witnessed by Appellant's attorney, Chris Sheffield, Esquire. There are also letters from Kohr to Megin wherein Kohr did not actually recant his trial testimony but implied that he was not entirely truthful at trial. The letters also suggest that Mr. Sheffield was performing some kind of services for Kohr and his wife when the 2006 recantation was prepared. Finally, Appellant proffered testimony from Lynn Varner, an inmate housed with Kohr when Appellant

_____

[1] In a May 21, 2015 order, the PCRA court permitted Appellant to include these documents in the certified record. The Commonwealth suggests that this issue was not preserved in Appellant's Pa.R.A.P. 1925(b) statement. We disagree since it clearly was subsumed by the position presented in that statement that the PCRA court erred in failing to find that Kohr testified falsely under an undisclosed arrangement. Throughout the May 21, 2015 PCRA proceeding, Appellant made futile attempts to introduce this extrinsic evidence, and it was obvious, from the contents of his Pa.R.A.P. 1925(b) statement, that he would contest the evidentiary rulings in this appeal.

[2] Contrary to Appellant's characterization, the document in question is not an affidavit.

was being tried. Varner represented that Kohr told Varner he lied when he testified about Appellant's confession and that Kohr admitted to Varner he had an undisclosed deal with the Commonwealth in exchange for his testimony.[3]

At the May 21, 2015 hearing, the Commonwealth objected to introduction of all of this extrinsic evidence as hearsay while Appellant countered that each piece of proof was admissible as a statement by Appellant against penal interest and subject to that exception to the hearsay rule.[4] N.T. Hearing, 5/21/15, at 44-46, 66-67, 79, 91, 102, 103. In Appellant's 2011 appeal, we specifically ruled that all of this evidence was hearsay and not subject to the statements-against-penal-interest exception to the hearsay rule. Specifically, we examined the May 1, 2006 typewritten statement purportedly signed by Kohr and concluded that it was inadmissible. **Harshman**, **supra** (2011 decision, unpublished memorandum

_____

[3] Appellant suggests that the 2015 PCRA court improperly refused to consider testimony from Kohr's then-ex-wife, Megin. However, Megin testified at the May 21, 2015 hearing. She authenticated Kohr's signatures on the letters sent to her. She already had testified in 2009 about the supposed deal between Mr. Nelson and Kohr. In his brief, Appellant fails to delineate how her May 21, 2015 testimony was restricted.

[4] Appellant never claimed at the PCRA hearing that his extrinsic hearsay proof fell within the prior inconsistent statements exception to the hearsay rule. He now levels this claim on appeal. Appellant's brief at 12. This position is waived. Pa.R.A.P. 302(a).

at 6).  We also held that "letters written by [Kohr] to his wife while he was imprisoned" were not subject to the hearsay exception for statements against penal interest.  *Id*.  Finally, we examined "the testimony of third parties [that included Varner,] who claim to have heard" Kohr "recant [his] trial testimony."  *Id*. at 7.  We held that the testimony in question also was not subject to the hearsay exception invoked by Appellant.  Accordingly, we "concluded that none of the proffered evidence qualified for the 'statement against interest' exception,'" and was inadmissible during the 2009 PCRA hearings.  *Id*. at 8.

It is well-ensconced in this Commonwealth that "judges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions."  ***Commonwealth v. Starr***, 664 A.2d 1326, 1331 (Pa. 1995).  This precept is known as the coordinate jurisdiction rule and "falls squarely within the ambit of a generalized expression of the 'law of the case' doctrine."  *Id*.  The law of the case doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter."  *Id*.  The related rules that comprise the law of the case doctrine include the principle that "upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court[.]"  *Id*.

Thus, this panel may not alter the 2011 legal decision that the May 1, 2006 document, the letters written by Kohr to his wife, and Varner's testimony were inadmissible hearsay and not subject to the statement-against-penal-interest exception to the hearsay rule. In 2015, we re-affirmed that the question of the admissibility of these items of proof had been already litigated in 2011 and could not be re-visited.

In addition to the above-analyzed items, Appellant, in this appeal, relies upon an October 20, 2000 police report about an interview police conducted with Kohr on an unspecified date earlier in October. The record also contains an October 26, 2000 police report about an October 16, 2000 interview with Kohr. According to the October 20, 2000 document, Kohr told police that he did not know Appellant's name. The October 26, 2000 police report states that during Kohr's October 16, 2000 interview, Kohr said the following. Approximately six weeks before October 16, 2000, Kohr was playing cards with Appellant, and Kohr asked Appellant "if he was the one who killed someone about ten years or so ago." Order of Court, 5/21/15, at Defense Exhibit 10. Appellant "replied 'Yeah'. [Appellant] said his wife was cheating on him and he had caught them. He then shot the guy five times and took the body 20 to 30 miles away." *Id*. Appellant also related to Kohr that "he would not be convicted because there is no evidence." *Id*. The October 26, 2000 police report outlined that Kohr submitted to a polygraph

examination "relative to this statement," on October 17, 2000. *Id*. Kohr passed that lie detector test. N.T. PCRA Hearing, 8/3/09, at 73.

On appeal, Appellant focuses on the October 20, 2000 police report wherein Kohr said he did not remember Appellant's name. However, the fact that Kohr did not want to cooperate with police earlier in October and later changed his mind does not render his trial testimony false. The record establishes that Kohr passed his lie detector test. Of note is that Varner told police that Appellant confessed to Varner that Appellant "shot a man for sleeping with his wife." *Id*. at 73; Order of Court, 5/21/15, at Exhibit 13. State police gave Varner a lie detector test, and Varner failed it. Mr. Nelson therefore refused to present Varner as a witness at Appellant's trial. N.T. PCRA Hearing, 8/3/09, at 73; *accord* Order of Court, 5/21/15, at Exhibit 13.

Finally, on appeal, Appellant relies upon two letters written to Mr. Sheffield. The first letter is a mundane letter that was not authenticated, failed to indicate that Kohr testified in exchange for favorable treatment, and was not a recantation.[5] Order of Court, 5/21/15, at Exhibit 6. The second

_____

[5] We note that this letter addressed to Mr. Sheffield is a single page signed by Kohr at the end, appears at page fourteen of the reproduced record, and it indicated that questions were attached. Pages fifteen and sixteen of the reproduced record are not questions. They contain a copy of a separate handwritten document containing a recantation of Kohr's trial testimony. In the certified record, the letter to Mr. Sheffield and the recantation document are also on separate pieces of paper having no apparent relation to each other. Nevertheless, they are both marked as Exhibit 6. Appellant never
*(Footnote Continued Next Page)*

letter cites Biblical scripture. *Id*. at Exhibit 8. The PCRA court properly ruled that these letters were inadmissible as irrelevant.

We also observe that Appellant continually claims in his brief that there was a secret arrangement between Granlun and the prosecution in exchange for Granlun's testimony and that the existence of that deal supports an inference that the same type of procedure was employed with respect to Kohr. However, the PCRA court found in 2010 that Granlun did not testify in exchange for favorable treatment in connection with his criminal charges, and we affirmed that finding. Therefore, for all purposes, there was no undisclosed bargain between Granlun and the Commonwealth.

Appellant also maintains that Granlun and Kohr were the "only two witnesses who could place [Appellant] with Mr. Snyder[.]" Appellant's brief at 11. Appellant overlooks the testimony of the victim's neighbors, who

_(Footnote Continued)_ ————————

established during the March 21, 2015 PCRA proceeding that the recantation document appearing at pages fifteen and sixteen of the reproduced record and as part of Exhibit 6 was written or signed by Kohr. It is not addressed to anyone. In addition, the signature at the end of the recantation purporting to be that of Kohr is materially different from any of Kohr's signatures on other documents of record.

Appellant's placement of the recantation behind the letter to Mr. Sheffield indicates that he is suggesting that Kohr wrote and sent it to Mr. Sheffield. This implication is neither supported by the record nor contextually from the letter addressed to Mr. Sheffield.

observed Appellant's vehicle on Mr. Snyder's property on the morning of Mr. Snyder's disappearance.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2016